IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BUTTE DIVISION

_____

| | |
|---|---|
| JOHN BRANDON LACEY, | Cause No. CV 12-37-BU-CSO |
| Petitioner, | |
| vs. | ORDER |
| LEROY KIRKEGARD, Warden, Montana State Prison; ATTORNEY GENERAL OF THE STATE OF MONTANA, | |
| Respondent. | |

_____

On June 13, 2012, Petitioner John Brandon Lacey filed this action seeking a writ of habeas corpus under 28 U.S.C. § 2254.  Lacey is a state prisoner proceeding pro se.

On July 20, 2012, Respondent ("the State") was ordered to file an Answer.  It complied on October 5, 2012.

On November 15, 2012, based on the parties' written consent, Consents (doc. 18-1) at 1-2, the case was reassigned to the undersigned for all further proceedings, including entry of judgment.

1

The State asserts that Lacey's second claim for relief, alleging both prosecutorial misconduct and ineffective assistance of counsel, was not sufficiently exhausted in state court and so is procedurally defaulted. The State does not assert a procedural defense to Lacey's first claim, which alleges a violation of his federal right to a speedy trial.

Having reviewed the parties' arguments and the applicable authorities, the Court will deny the petition for the reasons set forth below.

## I. Background

On April 7, 1999, Lacey was charged with two counts of sexual intercourse without consent, violations of Mont. Code Ann. § 45-5-503 (1995), and an arrest warrant was issued. The conduct was alleged to have occurred in the spring of 1995 and the summer of 1996. It involved one victim, J.G., who was at least 16 years old, the age of consent in Montana, on both occasions.[1]

On November 8, 2007,[2] Lacey was arrested in Arizona. After his arrest, Lacey moved to dismiss the charges for violation of his right to a speedy trial. Following

---

[1]  As he was under 18 for some of that time period, however, he is referred to by his initials in this Order, as are other persons who were under 18 at the time of the underlying events.

[2]  The trial court's Findings stated Lacey was arrested on October 8, 2007. Findings (doc. 12-3) at 4 ¶ 9. Other evidence, including testimony at the hearing, showed the arrest was made on November 8, 2007. Case Register Report (doc. 12-1) at 1; Mot. Hr'g Tr. (doc. 12-2) at 18:14-16. The discrepancy is not significant to the analysis.

a hearing on August 25, 2008, the trial court denied the motion.  Findings (doc. 12-3) at 1, 16.  Lacey was convicted on both counts at trial.  He appealed.  The Montana Supreme Court affirmed the trial court's denial of the motion to dismiss but remanded the case for a new trial due to an error in the admission of other-acts evidence.  *State v. Lacey*, 224 P.3d 1247, 1254 ¶ 26, 1255 ¶ 42 (Mont. 2010) ("*Lacey I*").

After Lacey was again convicted on both counts in the second trial, the trial court dismissed Count 1 because the State changed its theory at trial.  It had charged Lacey with using force, but it did not introduce evidence showing force.  The trial court affirmed the verdict on Count 2, in which the State had both alleged and introduced evidence that J.G. was asleep when Lacey penetrated him.  Order re: New Trial (doc. 12-14) at 14 ¶ 2.

Lacey was sentenced on February 9, 2011, to serve forty years in prison, with twenty years suspended.  He must complete two phases of the sexual offender treatment program at the prison and serve at least five years before becoming eligible for parole.  Sentencing Tr. (doc. 12-15) at 26:1-9, 29:6-22; Mont. Code Ann. § 46-23-201(3).

Lacey again appealed, arguing that the prosecutor commented he was guilty and that trial counsel were ineffective for failing to object.  The Montana Supreme Court rejected his arguments and affirmed his conviction on March 6, 2012.  *State v.*

3

*Lacey*, 272 P.3d 1288, 1291-93 ¶¶ 16-28 (Mont. 2012) ("*Lacey II*").

Lacey's conviction became final on June 4, 2012.  He timely filed his federal habeas petition on June 13, 2012.  28 U.S.C. § 2244(d)(1)(A); *Gonzalez v. Thaler*, __ U.S. __, 132 S. Ct. 641, 653-54 (2012).

## II.   Analysis

### A. Speedy Trial

The Sixth Amendment right to a speedy trial is binding on the States.  *Klopfer v. North Carolina*, 386 U.S. 213, 223 (1967).  The time between Lacey's arrest in the fall of 2007 and the commencement of his first trial in 2008, a period of eleven months to a year, was reasonable in view of the fact that the "ordinary procedures for criminal prosecution are designed to move at a deliberate pace."  *United States v. Ewell*, 383 U.S. 116, 120 (1966), *quoted in Barker v. Wingo*, 407 U.S. 514, 521 n.15 (1972).  But Lacey asserts he was deprived of a speedy trial because more than eight and a half years – 3,143 days – passed between the filing of the charges against him on April 7, 1999, and his arrest on November 8, 2007.  Lacey asserts that he was unaware of the charges and did not conceal his whereabouts.  He also claims that the State of Montana did not diligently attempt to locate him to bring him to trial.  Pet. (doc. 1) at 4 ¶ 15A.

## 1. State Courts' Application of Federal Law: § 2254(d)(1)

The Montana Supreme Court considered the merits of Lacey's speedy trial claim, *Lacey I*, 224 P.3d at 1251-54 ¶¶ 13-26, and Lacey fairly presented that claim as a federal one, *e.g.*, Appellant Br. at 14, *Lacey I* (doc. 12-4 at 20); *see also Davis v. Silva*, 511 F.3d 1005, 1009 (9th Cir. 2008); *cf. Dye v. Hofbauer*, 546 U.S. 1, 3-4 (2005) (per curiam); *Smith v. Digmon*, 434 U.S. 332, 333-34 (1978) (per curiam).

If the Montana Supreme Court applied federal law, Lacey must show its adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  Federal habeas relief is not available unless the state court's decision is "more than incorrect or erroneous," that is, "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  And, even if the state court does not speak to a federal claim at all, there is a strong but rebuttable presumption that it adjudicated a fairly presented federal claim on its merits. *Johnson v. Williams*, __ U.S. __, 133 S. Ct. 1088, 1096 (2013).

The Montana Supreme Court's opinion is not entirely clear on the application of federal law.  Although the supreme court's opinion in *Lacey I* references the Sixth and Fourteenth Amendments to the United States Constitution and cites *Barker v. Wingo, supra,* the court also gives an "indication," (*see Harrington v. Richter*, __

5

U.S. __, 131 S. Ct. 770, 784-85 (2011)), that it did not apply federal law.  In a footnote, the court said:

> In *Doggett v. U.S.*, 505 U.S. 647 (1992), the United States Supreme Court spelled out a similar four-factor speedy trial test.[3]  However, in resolving the case before us here, while we refer to federal court precedent, our decision today is based on the right to a speedy trial grounded in the Montana Constitution.

*Lacey I*, 224 P.3d at 1252 n.1 (parallel citations omitted).

This indication is corroborated by the independent nature of speedy trial analysis under Montana state law.  The State asserts that the Montana Supreme Court "relied upon the Montana Constitution and Montana case law to provide even more heightened scrutiny to its analysis," Mem. in Supp. of Answer (doc. 13) at 11, but the Montana Supreme Court did not expressly so hold.  In neither *Lacey I* nor in the controlling state speedy-trial case, *State v. Ariegwe*, 167 P.3d 815 (Mont. 2007), has the Montana Supreme Court said that the right to a speedy trial under Montana law gives greater protection to the accused or logically subsumes federal law.  Although state law presumes prejudice sufficient to trigger a speedy trial analysis accrues at 200 days, *Ariegwe*, 167 P.3d at 831 ¶ 41, rather than "as [the delay] approaches one year,"

---

[3] Similar, that is, to the test set forth in *State v. Ariegwe*, 167 P.3d 815 (Mont. 2007), which substantially revised state-law speedy trial analysis, *id.* at 826 ¶ 19.  The court undertook that revision because its "method of analysis has strayed considerably from the actual balancing approach envisioned in *Barker*." *Id.* at 828 ¶ 27 (referring to *Barker v. Wingo*, 407 U.S. 514 (1972)).

*Doggett*, 505 U.S. at 652 n.1, this fact alone does not necessarily mean that application of binding Montana precedents will implement equivalent or greater protection of the right to a speedy trial than application of binding federal precedents.

By way of contrast, Montana law clearly affords greater protection against double jeopardy than does federal law. *Compare, e.g.*, *Missouri v. Hunter*, 459 U.S. 359, 368-69 (1983) (holding that federal double jeopardy law permits, where authorized by legislature, cumulative punishments in single prosecution), *with State v. Guillaume*, 975 P.3d 312, 315-16 ¶¶ 11-16 (Mont. 1999) (prohibiting cumulative punishments in single prosecution based on Montana Constitution's prohibition against double jeopardy); *compare also* Mont. Code Ann. § 46-11-503 to -505 (2011) (prohibiting prosecution in Montana state court after prosecution in another jurisdiction), *with United States v. Lara*, 541 U.S. 193, 210 (2004), *Heath v. Alabama*, 474 U.S. 82, 88 (1985) (holding that successive prosecutions by separate sovereigns do not violate federal Double Jeopardy Clause). Thus, where the Montana law of double jeopardy is not violated, neither is federal law.

Where the right to speedy trial is concerned, a federal court cannot presume a Montana Supreme Court opinion that indicates it relies on state rather than federal law nonetheless encompasses a federal analysis. *See Williams*, 133 S. Ct. at 1096 (rejecting proposition that federal court should *always* assume a silent state court

opinion adjudicates a federal claim by asking "what if, for example, in at least some circumstances the state standard is *less* protective? . . . In such circumstances, the presumption that the federal claim was adjudicated on the merits may be rebutted").

The "independence" of speedy trial analysis under state law, *see Ariegwe*, 167 P.3d at 829 ¶ 35, combined with the Montana Supreme Court's footnote and reliance on state law in *Lacey I*, indicate that the Montana Supreme Court did not apply federal law to Lacey's speedy trial claim. *Compare, e.g.*, *Brown v. Bobby*, 656 F.3d 325, 329 (6th Cir. 2011) (concluding that Ohio court's reference to federal speedy trial right's applicability to States and to state cases relying on federal law showed that it considered its state law an implementation of federal law). This Court must conclude, therefore, that Section 2254(d)(1) does not apply.

## 2. State Courts' Factual Findings: § 2254(d)(2) and (e)(1)

Although 28 U.S.C. § 2254(d)(1) does not apply, § 2254(d)(2) refers only to the state court's adjudication of the claim on the merits, not to its application of federal law. The Montana Supreme Court undoubtedly adjudicated the claim. Consequently, § 2254(d)(2) applies. Federal habeas relief is precluded unless the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." In addition, § 2254(e)(1) provides that "a determination of a factual issue by a State court shall be

8

presumed to be correct" unless the petitioner rebuts it by "clear and convincing evidence."

In *Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004), the court explained that § 2254(d)(2):

> applies most readily to situations where petitioner challenges the state court's findings based entirely on the state record. Such a challenge may be based on the claim that the finding is unsupported by sufficient evidence, that the process employed by the state court is defective, or that no finding was made by the state court at all.

*Id.* at 999 (internal citations omitted). If the state court's findings withstand this "intrinsic review," then they "are dressed in a presumption of correctness" under § 2254(e)(1), "which then helps steel them against any challenge based on extrinsic evidence." *Id.* at 1000.

Here, there is no challenge based on extrinsic evidence. Lacey seeks to contradict the trial court's finding that he knew of the charges and concealed his whereabouts to avoid trial. Lacey also refers to a finding the trial court did not make, but the Montana Supreme Court did: "the State could have been more diligent." *Lacey I*, 224 P.3d at 1252 ¶ 19. Lacey challenges the extent of this finding, asserting that the State "did not pursue with due diligence" the charges against him. Pet. at 4 ¶ 15A.

Both of Lacey's challenges are "intrinsic" to the state court record. Although

"[t]he presumption of correctness and the clear-and-convincing standard of proof only come into play once the . . . findings survive any intrinsic challenge," *Taylor*, 366 F.3d at 1000, intrinsic review under § 2254(d)(2) is "particularly deferential," *id.* The state court's findings are objectively unreasonable only if the federal court, "applying the normal standards of appellate review," "could not reasonably conclude that the finding is supported by the record." *Id.* But:

> where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable. And . . . the state-court fact-finding process is undermined where the state court has before it, yet apparently ignores, evidence that supports petitioner's claim.

*Id.* at 1001 (internal citations omitted). "Deference does not by definition preclude relief. A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable." *Miller-El v. Crawford*, 537 U.S. 322, 340 (2003).

Lacey testified that he left Montana in the spring of 1997. He went to California for about 3 months, returned to Bozeman to pick up some personal belongings, then went to Texas, where his family owned a ranch, and went back to California for about a week. In December 1997, Lacey went to Mexico. Findings (doc. 12-3) at 6 ¶¶ 14-15. He announced his intentions in a letter to his daughter,

which she received in October or November 1997:[4]

> I received your letter but have been too sick to read it.  It will be the last thing for me to read.  I don't know what all the rumors are up there but I'm sure they must have started about the laundry room.  Hunter [Lacey's son] knows the whole story.  I've written him and am unable to repeat and go over it with him in private.  I certainly did nothing illegal.  If I'm guilty it is of being too lenient with those guys.  I know that because J. told me that he, Jess B. and Dan had a sex thing going way before we moved to Bozeman.  Josh's dad told me that Josh was caught having sex with another kid and had to go to counseling several years ago.  I was not part of their sex club and didn't try to stop their activities.  A few years ago such a thing – such things that were considered kids stuff that boys did together while growing up, experimenting sort of, it wasn't considered homo.  Nobody paid much attention to it.  Nowadays two guys can't even take a leak together without being gay.  I know you want to believe your friends but sometimes friends lie to hurt you to get something from you.  I know several of the boys would like to have sex with you and if you didn't or rejected them for any reason they might lie about me to hurt you.  I certainly never touched or had sex with any of them but I did catch them going at it together one time.  They know I know.  They were all mad at me after Gateway because I couldn't find us a job and I expected them to still pay rent.  There were some hard feelings about that.  I even called Josh's dad for $500.00 but he wouldn't pay anything.  So, I told Josh not to worry about it.  I took care of those boys like they were my own.  They wouldn't have moved in if I was some sex beast, would they?  Yes, I'm over-affectionate, but that's just my nature.  You know I've been extremely depressed and lonesome and sick for many years now.  I have cancer.  I have no insurance.  If I stay here mama will try to take care of me.  I can't let her.  When you get this I will be in Mexico seeking radical cancer therapy.  No chemo or radiation for me.  Mexico is cheaper at this point and it doesn't really matter.  I'm a little too far

---

[4]  The letter was introduced into evidence at the hearing on Lacey's motion to dismiss.  At trial, it was read into the record in its entirety.  *See Jamerson v. Runnels*, 713 F.3d 1218, 1227 (9th Cir. 2013) (court may consult materials that "merely reconstruct facts visible to the state trial court").

gone, I think, but I have to try.  I've given you and Hunter the ranch and the rights to sell it if you want.[5]  Hunter has all of the info.  Talk to him in private.  I wouldn't discuss your future plans with any of your 'friends' in case they want to 'help you.'  You should leave Bozeman and go somewhere else, you and Hunter and start that restaurant.  You'll have the money now.  Start anew.  Be strong.  Be smart.  Don't let the ugliness of the world get you down.  Try to forgive my memory of all the rage and hurt that I've caused you and remember the old days.  I'm crying over it and dying at the same.  I know you and Hunter never care to see me again and you won't.  I don't believe I can survive the cancer.  My daddy couldn't.  I'll always love you . . . .

Trial Tr. (doc. 12-13) at 365:5-367:20; *see also id.* at 368:5-18 (stating that Lacey's "Last Will and Testament" was enclosed with letter).  At the hearing on Lacey's speedy trial motion, he testified that he "had pretty well convinced [him]self" he had cancer "since my dad had died of cancer" and he was "feeling very bad, having night sweats, and different things," so he went to Mexico "to look into that as well as look for work in the sailing industry."  Mot. Hr'g Tr. at 8:18-9:1.

The State's investigation of the allegations against Lacey commenced in November 1997.  Findings (doc. 12-3) at 2 ¶ 2.  Detective Rich McLane of the City of Bozeman Police Department received information that Lacey was believed to be in Mexico.  Findings (doc. 12-3) at 2 ¶ 3; Mot. Hr'g Tr. (doc. 12-2) at 75:9-14.  To attempt to locate Lacey, McLane requested a records search from the Rocky

---

[5]  The Rocky Mountain Information Network check showed that a federal tax lien was filed against the ranch in February 1997, several months before Lacey wrote the letter.  Mot. Hr'g Tr. (doc. 12-2) at 74:6-7.

Mountain Information Network ("RMIN"), "one of several information networks across the United States," which traces persons through public utilities records, property records, and the like. RMIN covers a "western region, and Montana happens to fall in their area of responsibility." Mot. Hr'g Tr. (doc. 12-2) at 71:5-73:3. McLane testified that RMIN's report did not list any information about Lacey other than the ranch in Texas, which was subject to a federal tax lien, and a "John Lacey" in Plano, Texas, who had a telephone listing but "did not appear to match" John Brandon Lacey. Mot. Hr'g Tr. (doc. 12-2) at 73:4-75:3. The tax lien, which was filed in February 1997, named "John R. Lacy" as the debtor, but it showed Defendant Lacey's social security number. *Id.* at 73:19-74:7; Findings (doc. 12-3) at 2-3 ¶ 4 (referring to exhibit). "In its report to McLane, RMIN indicated that the Defendant 'was hard to find.'" Findings (doc. 12-3) at 3 ¶ 4. This conclusion was consistent with McLane's information that Lacey was not in the United States but in Mexico. McLane received RMIN's report in February 1998. He submitted the report and a request for prosecution to the County Attorney. Findings (doc. 12-3) at 2-3 ¶¶ 4-5.

On April 7, 1999, charges were filed and an arrest warrant was issued. The same day, the warrant was entered in the National Crime Information Center ("NCIC") database and endorsed for extradition. Detective McLane testified that, if the warrant and notation for extradition were maintained on active status, "it will

13

come back as what we would call a 'hit'" if Lacey had any contact with law enforcement that led to a warrants check.  The agency that contacted Lacey would then contact Gallatin County.  Mot. Hr'g Tr. (doc. 12-2) at 58:22-59:10, 63:11-14, 77:13-78:5.  Around the time the warrant was issued, someone told a deputy county attorney that Lacey was "in or around Baja or Mexico on a fishing boat."  Mot. Hr'g Tr. (doc. 12-2) at 62:12-15.

Lacey testified that he regularly piloted a boat between Mexico and San Diego or Catalina Island, California, about twice each year between 1998 and 2002.  He was paid in cash.  He testified that he checked in at the police dock on each occasion he entered into San Diego Harbor, used his own name, and presented a driver's license issued in 1997 for identification.  He also said he crossed the border from Mexico to California once in a bus.  Mot. Hr'g Tr. (doc. 12-2) at 9:2-11:10, 27:12-29:8.

The trial court found the warrant "remained active" in the NCIC database from 1999 until Lacey was arrested in 2007.  Findings (doc. 12-3) at 3 ¶¶ 6-9.  Even if the warrant became inactive at any time between April 1999 and July 2004, *compare* Mot. Hr'g Tr. (doc. 12-2) at 80:7-19 *with* Findings (doc. 12-3) at 4 ¶ 9, the evidence clearly showed that the warrant was maintained as active from July 2004 forward.

Lacey testified that, throughout the time in question, he stayed in touch with his mother, who passed away in 2005, and with an aunt, cousins, and a niece.  Mot.

14

Hr'g Tr. (doc. 12-2) at 11:17-24, 15:17-16:2, 44:8-13.  He also stated that, from the time he stopped traveling back and forth from Mexico in late 2002 or early 2003 until his arrest in Flagstaff, Arizona, in November 2007, he bought a vehicle and registered it in his own name; he was employed and received paychecks from which state and federal taxes were withheld; he had bank accounts at Wells Fargo; and he obtained a driver's license in Arizona, all in his own name.  *Id.* at 12:10-15:16, 34:22-36:7. He also testified that his living arrangements changed regularly.  He usually paid his rent in cash, often providing services in partial payment or in lieu of rent, and the owner of the property always kept the utilities services in the owner's name.  *Id.* at 28:19-29:20, 36:8-24, 38:23-39:18, 53:18-25.

On August 9, 2005, the NCIC system received a "hit."  The Department of Motor Vehicles in Las Vegas advised the Gallatin County Sheriff's Office that Lacey had "applied for a sales license in May of 2005, but shortly thereafter had been fired from his job at the dealership."  The Las Vegas authorities "advised they would attempt to locate" Lacey, but "[n]o further contact was forthcoming from Nevada." Findings (doc. 12-3) at 3-4 ¶ 8.  Lacey testified that he held the license for "four or five months" before leaving his employment with the dealership.  Mot. Hr'g Tr. (doc. 12-2) at 37:19-38:8; *see also id.* at 54:1-16.  He left that job to pursue a business bottling and selling hot sauce with a friend.  He incorporated the business in Nevada,

with himself as the registered agent, then moved to Arizona without updating the address.  Findings (doc. 12-3) at 7 ¶ 16.

Lacey testified he "had no idea that charges were pending against him in Montana."  Findings (doc. 12-3) at 7 ¶ 18.  In finding that this assertion "lack[ed] credibility," (*id.* at 8 ¶ 18), the trial court pointed out that his letter to his daughter speciously asserted he had cancer, that his intent to disappear was evidenced by his "Last Will and Testament" and his claim to leave the family ranch to his son and daughter, that he failed to attend his mother's funeral in 2005, and that he failed to file federal or state income tax returns to regain the funds he claimed were withheld while he was working in Nevada and Arizona.  *Id.* at 7-8 ¶¶ 17-18.  Finally, Lacey testified that his daughter and son did not know where to find him during the time in question.  Mot. Hr'g Tr. at 47:14-18.

Of course, Lacey could not have been aware of *charges* in 1997; no charges were filed until April 1999.  But the trial court found that Lacey knew he was implicated in serious criminal sexual misconduct and took deliberate measures over a long period of time to avoid being found.  This finding was not objectively unreasonable and is therefore binding on this Court.

### 3. Did the State Violate Lacey's Right to a Speedy Trial?

The state courts' factual findings are reasonable and binding under §

2254(d)(2).  Federal law is applied to them *de novo* because the Montana Supreme Court expressly applied state rather than federal law, § 2254(d)(1).  *Frantz v. Hazey*, 533 F.3d 724, 739 (9th Cir. 2008) (en banc); *Lacey I*, 224 P.3d at 1252 n.1.

"[T]he right to a speedy trial is a more vague concept than other procedural rights.  It is . . . impossible to determine with precision when the right has been denied."  *Barker v. Wingo*, 407 U.S. at 521.  Consequently, no rule sets forth a specific period of time within which a trial must commence.  Regardless of the vagueness of the concept, however, "the right to a speedy trial is as fundamental as any of the rights secured by the Sixth Amendment."  *Klopfer v. North Carolina*, 386 U.S. 213, 223 (1967).  States have "a constitutional duty to make a diligent, good-faith effort" to bring the accused to trial.  *Smith v. Hooey*, 393 U.S. 374, 383 (1969).  Courts consider the conduct of both the prosecution and the defense and employ a balancing test, weighing the length of the delay between charge or arrest and trial, the reason for the delay, whether the defendant asserted his right to a speedy trial, and whether he was prejudiced as a result of the delay.  *Barker*, 407 U.S. at 530.  No one factor has "talismanic" significance.  *Id.* at 533.

### a. Length of the Delay

Delay "approach[ing] one year" generally crosses the threshold between "ordinary" and "presumptively prejudicial" delay.  *Doggett*, 505 U.S. at 652 & n.1.

The length of the delay here is extraordinary – nine and a half years, or 3,472 days, from the filing of charges to trial, eight and a half years from charges to arrest. Findings (doc. 12-2) at 9 ¶ 4.  The length of the delay alone weighs in Lacey's favor.

### b. Reasons for the Delay and Assertion of the Right

While "[a] defendant has no obligation to bring himself to trial," *Barker*, 407 U.S. at 527, avoiding being brought to trial is different.  Where the State makes reasonably diligent efforts to locate a defendant, the Sixth Amendment generally will not demand dismissal of charges merely because the State's efforts prove unsuccessful.

Here, the State entered the April 1999 warrant in the NCIC system and endorsed it for extradition.  It maintained that warrant on a regular basis until it was executed by authorities in Arizona eight and a half years later.  An officer testified at the hearing that "Gallatin County alone has several thousand warrants outstanding as we sit here right now."  Mot. Hr'g Tr. (doc. 12-2) at 82:24-83:1.  Although an officer is detailed to track those warrants, "it's one person and a thousand warrants."  *Id.* at 83:2-6.  In addition, the testimony was essentially undisputed that Gallatin County had no information putting Lacey anywhere other than Mexico.[6]  Maintaining the

---

[6] The Montana Supreme Court referred to California.  The testimony regarding what Gallatin County knew of Lacey's whereabouts after it began its investigation appeared to refer to Baja California in Mexico, not the State of California in the United States.

warrant with extradition endorsement was a reasonable measure to take to ensure that Lacey would be brought to trial if he returned to the United States and did anything to trigger a warrant check. While there may have been other measures the State could have taken, as the Montana Supreme Court suggested, *Lacey I*, 224 P.3d at 1252, the State promptly responded when Lacey was arrested and promptly brought him back to Montana. Lacey was arrested on November 8, 2007, and appeared for arraignment in Gallatin County on December 3, 2007. Case Register (doc. 12-1) at 1-2 Entries 1-7. The trial court reasonably found the reason for the delay was Lacey's disappearance, not the State's negligence or inaction.

### c. Prejudice

Prejudice is typically "the stickiest facet of the problem." *United States v. Mann*, 291 F. Supp. 268, 274 (S.D.N.Y. 1968) (Frankel, J.), *recommended by Barker*, 407 U.S. at 533 n.36.

The United States Supreme Court's leading case on prejudice is *Doggett v. United States*, 505 U.S. 647 (1992). In *Doggett*, the Supreme Court confronted a delay of eight and a half years that accrued after the defendant was charged and before he was arrested. For six of those years, Doggett was in Colombia and Panama. Eventually, he "passed unhindered through Customs in New York City and settled

19

down in Virginia." *Doggett*, 505 U.S. at 649.[7]  The Court held the United States

violated the defendant's Sixth Amendment right to a speedy trial.   The Court

described the issue before it as follows:

> The Federal Magistrate hearing [Doggett's] motion [to dismiss for lack
> of speedy trial] applied the criteria for assessing speedy trial claims set
> out in *Barker v. Wingo*: "[l]ength of delay, the reason for the delay, the
> defendant's assertion of his right, and prejudice to the defendant."  The
> Magistrate [Judge] found that the delay between Doggett's indictment
> and arrest was long enough to be "presumptively prejudicial," that the
> delay "clearly [was] attributable to the negligence of the government,"
> and that Doggett could not be faulted for any delay in asserting his right
> to a speedy trial, there being no evidence that he had known of the
> charges against him until his arrest. The Magistrate [Judge] also found,
> however, that Doggett had made no affirmative showing that the delay
> had impaired his ability to mount a successful defense or had otherwise
> prejudiced him.   In his recommendation to the District Court, the
> Magistrate [Judge] contended that this failure to demonstrate particular
> prejudice suffced to defeat Doggett's speedy trial claim.

*Doggett*, 505 U.S. at 650 (internal citations omitted).   In *Doggett*, the Court

specifically rejected the United States' contention that the Speedy Trial Clause does

not significantly protect a criminal defendant's interest in fair adjudication:  "In so

arguing, the Government asks us, in effect, to read part of *Barker* right out of the law,

and that we will not do."  *Id.* at 654 (citing *Moore v. Arizona*, 414 U.S. 25, 26 (1973)

---

[7]  When Doggett returned to the United States, he "married, earned a college degree, found
a steady job, lived openly under his own name, and stayed within the law."  The DEA failed to locate
him.  But "when the Marshal's Service ran a simple credit check on several thousand people subject
to outstanding arrest warrants," "within minutes, [it] found out where Doggett lived and worked."
*Doggett*, 505 U.S. at 650.

(per curiam) ("*Barker v. Wingo* expressly rejected the notion that an affirmative demonstration of prejudice was necessary to prove a denial of the constitutional right to a speedy trial.")).

Clearly, neither Lacey nor Doggett suffered "oppressive pretrial incarceration" during the eight and a half year delay. *Barker*, 407 U.S. at 532; *Doggett*, 505 U.S. at 654. In the matter of "anxiety and concern," Doggett and Lacey were differently situated, because Lacey appeared to be deliberately dodging detection. Lacey's "anxiety and concern" was likely keen, but it was his own creation.

But "the possibility that the defense will be impaired" is "the most serious" form of prejudice:

> [T]he inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown.

*Barker*, 407 U.S. at 532, *quoted in part in Doggett*, 505 U.S. at 654, 655. Courts "generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Doggett*, 505 U.S. at 655. Thus, "the presumption that pretrial delay has prejudiced the accused intensifies over time." *Id.  Doggett* concluded:

As an alternative to limiting *Barker*, the Government claims Doggett has failed to make any affirmative showing that the delay weakened his ability to raise specific defenses, elicit specific testimony, or produce specific items of evidence. Though Doggett did indeed come up short in this respect, the Government's argument takes it only so far: consideration of prejudice is not limited to the specifically demonstrable, and, as it concedes, affirmative proof of particularized prejudice is not essential to every speedy trial claim. *See Moore*, *supra*, 414 U.S., at 26; *Barker*, *supra*, 407 U.S., at 533. *Barker* explicitly recognized that impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony "can rarely be shown." And though time can tilt the case against either side, one cannot generally be sure which of them it has prejudiced more severely.

*Doggett*, 505 U.S. at 655 (parallel and some internal citations omitted).

Under the facts of Lacey's case, the probability of prejudice was both significant and relatively easy to understand. The State's case depended on the victim's testimony that Lacey knew the victim was incapable of consent because he was deep in an alcohol-facilitated sleep when Lacey penetrated him. It is conceivable that it may have been difficult for Lacey to recall the incident well enough to present a detailed or corroborated defense. It is not beyond question that a third person was present in the house on that unspecified day in the summer of 1996, but neither Lacey nor that person had the slightest recollection of the facts at the time of Lacey's arrest in the fall of 2007. As *Barker* says, no one remembers what they have forgotten.

But similar dilemmas of recall are a routine and inevitable part of any criminal

trial, speedy or not.  An accused is not entitled to a perfect trial, only a fair one. *Lutwak v. United States*, 344 U.S. 604, 619 (1953).  As *Barker* and *Doggett* explain, the longer a trial is delayed, the less fair it is likely to be.  Fairness is more likely to be preserved where documentary or forensic evidence is involved or each side may call multiple witnesses to the criminal act.  It is less likely to be preserved in circumstances like those at issue here.

Nonetheless, the *Doggett* Court concluded, "[w]hen the Government's negligence thus causes delay six times as long as that [year] generally sufficient to trigger judicial review, and when the presumption of prejudice, albeit unspecified, is neither extenuated, as by the defendant's acquiescence [citing *Barker v. Wingo*, 407 U.S. at 534-35 (noting the defendant's acquiescence in continuances of the trial date)], nor persuasively rebutted, the defendant is entitled to relief." *Id.* at 658.  Here, it was Lacey's own persistent attempts to avoid responsibility in Gallatin County, not Gallatin County's negligence, that caused the delay.  There is prejudice under *Doggett*, but it is, at the least, "extenuated" by Lacey's absence during the eight and a half years of delay.  In contrast, the evidence in *Doggett* indicated that the defendant was not aware of the charges until he was arrested and that, had the government made a serious effort to find him, they could have done so "within minutes" because he had returned to the United States, "married, earned a college degree, found a steady job

23

as a computer operations manager, [and] lived openly under his own name." *Id.* at 649-50. The same conclusion cannot be reached in this case.

### d. Conclusion

The trial court reasonably found that Lacey knew enough about the State's interest in his activities in Gallatin County to take steps to ensure he was not likely to be found. As Lacey's conduct was the reason for the delay, the prejudice that accrued to him over time was extenuated. *Doggett*, 505 U.S. at 658. Taking all the factors into consideration, the State did not violate Lacey's Sixth Amendment right to a speedy trial. This claim is denied.

### B. Prosecutorial Misconduct and Ineffective Assistance of Counsel

Lacey asserts two additional claims. He contends that the prosecutor committed misconduct "in her opening statement and throughout the trial" by telling the jury that she knew him to be guilty. He also contends that trial counsel were ineffective because they failed to object to her misconduct. Pet. (doc. 1) at 4 ¶ 15B.[8]

On direct appeal, Lacey relied on two comments by the prosecutor. Concluding her opening statement, the prosecutor said:

> Mr. Lacey was apprehended in Arizona and brought back to face these charges, to face J.G. on that stand, to face his daughter on that stand, to

---

[8] Lacey's federal petition does not allege the claim he made on direct appeal regarding the prosecutor's statements pertaining to witness credibility.

face J.B. on that stand, and at the conclusion of the testimony to face
your verdict which should be guilty, *as he is*.

Trial Tr. at 182:18-24 (emphasis added).  And the prosecutor concluded her initial

closing argument by saying, "Please go back there and find him guilty because, *by*

*God, he is*."  Trial Tr. at 651:16-652:7 (emphasis added).

### 1. Prosecutorial Misconduct

The State asserts that Lacey's federal petition does not fairly plead his claim

of prosecutorial misconduct in this Court because he did not cite federal law.  Mem.

in Supp. of Answer (doc. 13) at 19-23.  But *Dye v. Hofbauer*, 546 U.S. 1 (2005) (per

curiam), held that "an appended supporting brief . . . presented Dye's federal claim

with more than sufficient particularity."  *Id.* at 4.  Lacey appended to his petition a

supporting brief – the same brief he filed on the issue in state court.  *See* Pet.

Attachment (doc. 1-3) (Appellant Br., *State v. Lacey*, No. 11-0193 (Mont. filed Aug.

17, 2011)).  He has fairly pled the claim.

In the state courts, Lacey properly exhausted this claim by raising it on direct

appeal, citing federal law, and pointing to the operative facts, that is, to particular

statements by the prosecutor.  *Davis v. Silva*, 511 F.3d 1005, 1009 (9th Cir. 2008).

The Montana Supreme Court had "an opportunity to act" on his claim.  *O'Sullivan*

*v. Boerckel*, 526 U.S. 838, 842 (1999).

25

But Lacey did not object at trial to the portions of the prosecutor's opening statement or closing argument that he asked the Montana Supreme Court to review on appeal.[9]  *See State v. Jackson*, 221 P.3d 1213, 1223-24 ¶ 42 (Mont. 2009). Because the claimed error was not preserved at trial for appellate review, Lacey asked the Montana Supreme Court to exercise its inherent authority to review the claim despite his failure to object.  The Montana Supreme Court ultimately "declined to apply plain error review."  Mem. in Supp. of Answer (doc. 13) at 22.

### a. Adequate and Independent State Grounds Doctrine

When a petitioner meets the exhaustion requirement, as Lacey did, the state court has had a "fair opportunity" to consider his claims before a federal court does so.  Nonetheless, where the state court declines to consider the federal claim because the petitioner failed to comply with a state procedural rule, the federal court still has a comity obligation to the state court.  The state's procedural rules and the exhaustion requirement would soon become irrelevant if federal courts routinely reviewed claims that were not presented in state court in accordance with state law.  Therefore, just as the United States Supreme Court will not grant certiorari review where a federal claim has been decided on independent and adequate state grounds, so in habeas,

---

[9]  Trial counsel objected three times to the prosecutor's rebuttal closing argument, *see* Trial Tr. (doc. 20-1) at 684:20-685:4, 686:20-687:2, 694:7-695:8, but not to the remarks appellate counsel relied on.

dismissals based on a petitioner's failure to comply with a state procedural rule will generally preclude federal habeas review. *See Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991).

To preclude federal habeas review, a state's rule must be both adequate to support the judgment and independent of federal law. *Harris v. Reed*, 489 U.S. 255, 260-62 (1989); *Coleman*, 501 U.S. at 735, 740-44. The adequacy of a state's procedural bar is a federal question. *Lee v. Kemna*, 534 U.S. 362, 375 (2002). A state procedural bar is "adequate" if it was "firmly established and regularly followed," *Collier v. Bayer*, 408 F.3d 1279, 1284 (9th Cir. 2005) (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)), that is, "clear, consistently applied, and well-established," *id.*, at the time the petitioner was required to comply with it. A rule that is generally adequate can be deemed inadequate if the state court applies the rule in a manner that is "exorbitant," *Lee*, 534 U.S. at 376, or "unrealistic," *Reece v. Georgia*, 350 U.S. 85, 89 (1955); *see also Hoffman v. Arave*, 236 F.3d 523, 531 (9th Cir. 2001). The Court is required to consider both published and unpublished decisions of state courts in determining the adequacy of a state procedural bar. *Powell v. Lambert*, 357 F.3d 871, 879 (9th Cir. 2004). A state procedural rule is "independent" if its application is not intertwined with an explicit or implicit holding of federal law. *Ake v. Oklahoma*, 470 U.S. 68, 74-75 (1985); *Coleman*, 501 U.S. at 734-35.

27

### b. State Rules Applied in Lacey's Case

In Lacey's case, two state rules are relevant.  Rule No. 1 is the "contemporaneous objection" rule.  It provides that failure to object at trial waives the right to appellate review of the claimed error.  *See* Mont. Code Ann. § 46-20-104(2) (1983); *State v. Stock*, 256 P.3d 899, 908 ¶ 47 (Mont. 2011) (quoting *State v. Vukasin*, 75 P.3d 1284, 1291 ¶ 37 (Mont. 2003)); *State v. Weeks*, 891 P.2d 477, 490 (Mont. 1995).  The contemporaneous objection rule has nothing to do with the law or facts supporting a particular claim.  Consequently, it is generally adequate and independent to support a state court's decision denying relief.  *Wainwright v. Sykes*, 433 U.S. 72, 88-90 (1977).  This Court is not aware of inconsistency in the Montana Supreme Court's application of the long-established contemporaneous objection rule.  There can be circumstances in which the contemporaneous objection rule is unrealistically applied and so not adequate to preclude federal review, *see, e.g.*, *Osborne v. Ohio*, 495 U.S. 103, 123 (1990); *Johnson v. Mississippi*, 486 U.S. 578, 587-89 (1988), but there was nothing redundant or unrealistic in Lacey's case about expecting defense counsel to object to the portions of the prosecutor's closing that he wanted to preserve for appellate review.  Like other jurisdictions' similar rules, Montana's contemporaneous objection rule is firmly established, regularly followed, and wholly independent of federal law.

28

Rule No. 2 is the state rule that the Montana Supreme Court may make exceptions to Rule No. 1 for "plain error." Like Rule No. 1, this rule, too, is common among American jurisdictions. But, because its application depends in part on the nature of the claimed error, its independence is less evident than Rule No. 1's independence. The question here is whether the Montana Supreme Court's consideration of Rule No. 2 in Lacey's case supersedes or renders ineffective Rule No. 1's otherwise adequate and independent support for the state's procedural default defense. Ninth Circuit precedent holds that, where the state court "reviewed the merits for plain error" or finds that "no fundamental error was committed," its decision does not rest on a state procedural bar, and federal review is available. *Walker v. Endell*, 850 F.2d 470, 473-74 (9th Cir. 1988) (citing *Huffman v. Ricketts*, 750 F.2d 798, 800-01 & n.2 (9th Cir. 1984)). But, where the court does not "review[] the merits for plain error," then Rule No. 1 is not superseded.

The difficulty arises in determining what constitutes "review[ing] the merits for plain error." In *State v. Finley*, 915 P.2d 208 (Mont. 1996),[10] for instance, the court discussed plain error doctrine at length, setting out a two-step process. First, it determined whether the claimed errors were of a nature that made plain error review

---

[10] This decision was overruled on other grounds by *State v. Gallagher*, 19 P.3d 817, 822 ¶ 21 (Mont. 2001).

appropriate.  Quoting the United States Supreme Court's observation that plain error review is most appropriate "when 'rights are asserted which are of such high character as to find expression and sanction in the Constitution or Bill of Rights,'" *Finley*, 915 P.2d at 213 (quoting *Weems v. United States*, 217 U.S. 349, 362 (1910)), the *Finley* court concluded that it would exert its inherent authority to review unpreserved errors only if the claimed errors "implicate a criminal defendant's fundamental constitutional rights," *id.* at 215.  *Cf. Stewart v. Smith*, 536 U.S. 856, 860 (2002).  Then, "[a]fter reviewing the claimed violation of Finley's fundamental constitutional rights under the plain error doctrine," the court concluded "that the comments made by the prosecutor did not implicate *Doyle* error[11] nor did such comments infringe upon Finley's privilege against self-incrimination."  *Id.* at 218.  The *Finley* court ultimately found that no constitutional error occurred at all, *id.* at 216, although Finley's allegation that it did warranted plain error review.

In this case, by contrast, the Montana Supreme Court proceeded in one step:

The prosecutor's comments do not stray so far from permissible, however, to satisfy our standard for the exercise of plain error review. The prosecutor buried her statements within an otherwise well supported, and permissible, commentary on the evidence and the credibility of witnesses.  The context in which the prosecutor made the statements prevents us from determining that plain error review should be applied under the circumstances.

---

[11]  *See Doyle v. Ohio*, 426 U.S. 610 (1976).

30

*Lacey*, 272 P.3d at 1292-93 ¶ 26.  It is fair to describe this decision as a "peek" at the merits of the claim, but it is hardly fair to read it as an application of controlling federal constitutional law, *Darden v. Wainwright*, 477 U.S. 168 (1986), and *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974).  The appellate brief, while sufficient to exhaust the claim for purposes of federal habeas review, did not direct the Montana Supreme Court's application of federal law by applying the *Darden* factors to Lacey's case.  Neither Lacey nor the court discussed the weight of the evidence, the prominence of the comment in the context of the entire trial, or whether the trial court properly instructed the jury that counsels' closing arguments were not evidence. *Darden*, 477 U.S. at 181-83 & nn.11-12; *see also Hein v. Sullivan*, 601 F.3d 897, 912-13 (9th Cir. 2010) (citing *Darden*, 477 U.S. at 182, and listing other factors).

Had the Montana Supreme Court held that no federal constitutional violation occurred, as in the second step of *Finley*, 915 P.2d at 216-18, or had the appellate brief squarely presented the merits of the federal issue, *cf. Smith v. Digmon*, 434 U.S. 332, 333-34 (1978), it is possible this Court might be required to employ a different analysis.  But under the circumstances here, to decide that the Montana Supreme Court "reviewed the merits" of the federal claim in considering whether Lacey's claim of prosecutorial misconduct qualified for plain error review would be tantamount to requiring the Montana Supreme Court to reformulate its own plain

31

error doctrine.  That is not a proper function of a federal habeas court.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

The Montana Supreme Court gave a plain statement that its decision rested on Rule No. 1.  *See Lacey II*, 272 P.3d at 1291 ¶ 14; *Harris*, 489 U.S. at 261 (quoting *Michigan v. Long*, 463 U.S. 1032, 1042 (1983)).  It also considered making an exception to Rule No. 1 to consider Lacey's claim of prosecutorial misconduct. *Lacey II*, 272 P.3d at 1292 ¶ 23.  It concluded it would not make an exception to Rule No. 1.  *Id.* at 1292-93 ¶ 26.  Rule No. 1 is an adequate and independent state ground to support the judgment against Lacey.  *Sykes*, 433 U.S. at 88-90; *see also Campbell v. Burris*, 515 F.3d 172, 177 & n.3, 178-79 (3d Cir. 2008).

### c. Conclusion: Prosecutorial Misconduct

Consequently, Lacey's claim of prosecutorial misconduct is procedurally barred.  Lacey was given an opportunity to excuse his procedural default, *see* Order to Pet'r to Show Cause (doc. 21) at 3-7, 8 ¶ 1, but he declined to do so, *see* Resp. to Order (doc. 22) at 1.  The claim is dismissed with prejudice as procedurally defaulted without excuse.

### 2. Ineffective Assistance of Counsel

The Montana Supreme Court considered the merits of Lacey's claim that trial counsel were ineffective for failing to object to particular comments by the

prosecutor. *Lacey II*, 272 P.3d at 1293 ¶¶ 27-28. Claims of ineffective assistance of trial counsel are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). Lacey must show both that counsel's performance fell below an objective standard of reasonableness, *id.* at 687-88, and that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. "[T]here is no reason . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

While courts cannot make "a *post hoc* rationalization of counsel's conduct" without regard to whether counsel actually recognized and considered viable alternative strategies, *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003), there was nothing unreasonable about the Montana Supreme Court's ultimate conclusion. The transcript shows that, rather than objecting to the prosecutor's comments, defense counsel responded in the defense closing that the prosecutor had "asked you to disregard the law, " had argued that Lacey is "a bad guy" without regard to the law. Trial Tr. (doc. 20-1) at 654:3-8. Defense counsel also argued that the case was not "about trust and authority" and not "about the age gap." *Id.* at 655:12-13. When the prosecutor was making her final closing – and thus when defense counsel had no further opportunity to address the jury – defense counsel did object to portions of the prosecutor's rebuttal closing argument , including an objection that the prosecutor

33

was "putting her opinion in." *Id.* at 684:20-685:4, 686:20-687:2, 694:7-695:8.

Defense counsel's performance in closing argument was reasonable.

Although the Montana Supreme Court did not specifically address it, Lacey's appellate brief also referred to the prosecutor's concluding comment in her opening statement:

> Mr. Lacey was apprehended in Arizona and brought back to face these charges, to face [J.G.] on that stand, to face his daughter on that stand, to face Jesse on that stand, and at the conclusion of the testimony to face your verdict which should be guilty, *as he is*.

Trial Tr. at 182:18-24 (emphasis added). During the opening statements, there was no evidence before the jury from which a reasonable person could draw a reasonable inference of guilt. The prosecutor could only have been stating a personal opinion based on her personal acquaintance with the facts. That is irrelevant, improper, and objectionable. But it cannot be said there is a reasonable probability the jury would have acquitted Lacey if only counsel had objected to this comment. Though improper, the comment is too slender a reed on which to hang a finding of prejudice due to defense counsel's performance. This claim is denied.

### III. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2254

Proceedings.  A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  Where a claim is dismissed on procedural grounds, the court must also decide whether "jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Lambright v. Stewart*, 220 F.3d 1022, 1026 (9th Cir. 2000) (quoting *Slack*, 529 U.S. 473, 484 (2000)).

A COA is granted on the speedy trial issue.

Lacey's claim of prosecutorial misconduct is procedurally barred.  He was given an opportunity to excuse his default.  He elected not to do so.  Although the claim meets the undemanding threshold of § 2253(c)(2), reasonable jurists could find no grounds for debate in the procedural ruling.  A COA is not warranted as to this claim.

Finally, Lacey's claim of ineffective assistance of counsel focused on his lawyers' failure to object to two comments by the prosecutor.  As to closing argument, counsel's performance was reasonable.  As to opening statement, while the

35

prosecutor made an objectionable remark and counsel could have objected, reasonable jurists would not find that the standard for prejudice is met.  There is no reasonable probability that Lacey would have been acquitted if only counsel had objected to the prosecutor's final remark in opening statement.  A COA is not warranted as to Lacey's claims of ineffective assistance of counsel.

Based on the foregoing, the Court enters the following:

## ORDER

1.  Lacey's Petition (doc. 1) is DENIED.

2.  The Clerk of Court shall enter judgment, by separate document, in favor of Respondents and against Petitioner Lacey.

3.  A certificate of appealability is GRANTED as to the speedy trial claim and DENIED on the claims of prosecutorial misconduct and ineffective assistance of counsel.

DATED this 23rd day of September, 2013.

/s/   Carolyn S. Ostby
United States Magistrate Judge